```
            UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
```

SECURE US, INC.,
a West Virginia corporation,

    Plaintiff

v.                                    CIVIL ACTION NO. 2:04-0252

**SECURITY ALARM FINANCING
ENTERPRISES, INC.**, a corporation,

    Defendant

## MEMORANDUM OPINION AND ORDER

Pending is defendant's motion for partial summary judgment filed November 19, 2004.

### I.

Plaintiff and defendant are in the home and commercial security monitoring industry.  Plaintiff, a West Virginia corporation, has been involved in the business since the mid-1990s.  Defendant, a California corporation, apparently purchases security monitoring contracts and then assigns the actual monitoring of the underlying security systems to another company. Defendant entered the West Virginia market between 1999 and 2003 through a series of transactions with Kesler Communications, Inc.

("Kesler"). Kesler formerly provided security monitoring services in this state. Defendant asserts that from 1999 to 2003 Kesler assigned it approximately 4,145 customer accounts with recurring monthly revenue of approximately $73,573.79.[1] The assigned contracts provided typically for an initial term of three (3) years, with automatic renewal term on a year-to-year basis unless the customer canceled.

In June 2003, Kesler withdrew from the security monitoring business. At that time, plaintiff agreed to purchase certain assets from Kesler, including its telephone numbers. It appears defendant and Kesler had earlier agreed that Kesler would not assign its phone numbers to a competitor. Defendant, however, was unaware of the transaction between Kesler and plaintiff at the time it occurred.

Plaintiff began taking calls from former Kesler, now defendant's, customers, requesting service for their existing systems. Some customers expressed dissatisfaction with the service they were receiving from Kesler/defendant. Using copies

---

[1] Recurring monthly revenue is a phrase of art used in the security alarm industry. It refers to the total amount payable by a security monitoring customer for monthly services. It is typically used for, inter alia, pricing accounts for purposes of their acquisition.

of the Kesler contracts previously sold to defendant, and later provided to plaintiff by Kesler, plaintiff also sent mailings to defendant's customers, advising them it had taken over Kesler's phone lines and that "we're here for you."  Plaintiff asserts, however, that it contacted defendant's customers only after their security contracts with defendant and Kesler expired.  Plaintiff also contends it neither requested nor encouraged any former Kesler customers to breach their obligations under the contracts.

Plaintiff knew about the transaction between Kesler and defendant.  In fact, defendant asserts Mitch Brozik, plaintiff's president, analyzed each Kesler contract and assigned a staff member to create a spreadsheet detailing information on each of defendant's former Kesler customers.  Plaintiff also retained a former Kesler telemarketer, Cheryl Sober, to solicit the customers.  Ms. Sober was apparently paid an incentive bonus by plaintiff for each of defendant's customers that canceled and signed up with plaintiff.  Plaintiff contacted 1,300 customers that Kesler had assigned to defendant.  To date, no fewer than 170 of defendant's former customers have retained plaintiff to provide security monitoring services.

Plaintiff initially asserted that, to the best of its knowledge, it only contacted individuals whose initial 3-year

contractual term with Kesler/defendant had previously expired. Plaintiff has now stipulated that "[c]ertain of [defendant's] West Virginia customers solicited by [plaintiff] were in the initial term of their" contracts with Kesler/defendant. (Jt. Stips. ¶ 17.)  Plaintiff also contends that, as a result of the circular, it was only able to establish new contracts with roughly 170 customers, rather than the 650 new contracts it expected.

In late 2003, defendant asserts it first learned someone was directly soliciting its West Virginia customer base, resulting in customer attrition, confusion, and a potential "double liability" for security monitoring services.  In response, defendant sent a circular to its West Virginia customers, and presumably some of defendant's former customers now being serviced by plaintiff, containing, among other negative statements, the following:

1. "DON'T BE DECEIVED"

2. "IT HAS COME TO OUR ATTENTION THAT YOU MAY HAVE BEEN TARGETED FOR A SCAM"

3. "[W]e must make you aware that there have been some companies in your area that have recently resorted to devious and illegal means of gaining your business, which could result in damage to your system or result in financial loss."

4. "FRAUD ALERT"

4

Plaintiff asserts the circular was sent to over 1,000 West Virginia residents.  The circular did not identify plaintiff by name, and defendant asserts it has used the same document since 2002 in five other states.

On February 17, 2004, plaintiff instituted this action in the Circuit Court of Kanawha County, alleging claims for tortious interference and defamation.  On March 19, 2004, defendant removed on both diversity and federal question grounds.  Defendant filed a counterclaim for (1) defamation, (2) tortious interference, and (3) common-law unfair competition.

On March 26, 2004, defendant moved to dismiss.  The court granted in part and denied in part the motion, holding (1) plaintiff's tortious interference allegations were sufficient to state a claim; (2) defendant was not entitled to dismissal of the tortious interference claim under a legitimate competition defense in view of the undeveloped record; (3) plaintiff's defamation allegations were sufficient to state a claim; (4) a question of fact existed as to whether the circular referred to plaintiff, and (5) the First Amendment prohibited plaintiff from preventing defendant's use of truthful and otherwise appropriate commercial speech.

Defendant has now moved pursuant to Rules 56(a) and (b), seeking judgment as a matter of law on its counterclaim for tortious interference and on plaintiff's claims for tortious interference and defamation.

II.

A.  Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of showing -- "that is, pointing out to the

district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); Id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is not appropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

In reviewing the evidence, a court must neither resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have

his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

B.  Counterclaim

Defendant seeks judgment as a matter of law on its counterclaim for tortious interference. To establish a prima facie case of tortious interference, a party must demonstrate (1) the existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages. Syl. Pt. 2, <u>Torbett v. Wheeling Dollar Sav. & Trust Co.</u>, 173 W. Va. 210, 211, 314 S.E.2d 166, 167 (1983).

Although central to the inquiry, the court has been provided very little information concerning the content and timing of plaintiff's communications with the Kesler/defendant customers. For example, it would not be an intentional act of

8

interference if plaintiff merely contacted Kesler/defendant customers and advised them of plaintiff's existence and the generic nature of its services.  If plaintiff were prohibited from doing so, it might amount to an impermissible restriction on commercial speech.  In contrast, if there was other content that induced or encouraged Kesler/defendant customers to breach their contractual obligations, it would be another matter entirely.[2]

This customer- and content-specific showing awaits further development at trial.[3]  The court, accordingly, ORDERS

---

[2]Defendant all but concedes the claim is not fully ripe for summary judgment purposes.  It states "[w]hile the <u>full scope</u> of [plaintiff's] tortious interference, as measured in part by the number of [defendant's] customers wrongfully solicited, will be the subject of the forthcoming trial, the fact that [plaintiff's] actions constitute <u>some measurable degree</u> of tortious interference is beyond debate."  (Def.'s Memo. in Supp. at 8 (emphasis added.)

[3]The court also notes there are a host of fact-intensive defenses to the claim, some of which appear to be in play presently, but not adequately developed in the record:

> "If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. [Alleged wrongdoers] are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper."

(continued...)

that defendant's motion for partial summary judgment on its tortious interference claim be, and the same hereby is, denied.

C.  Complaint

Defendant also seeks judgment as a matter of law on plaintiff's claims for tortious interference and defamation.

### 1.  Tortious Interference

Regarding the tortious interference claim, plaintiff asserts it is entitled to relief because the circular interfered with the contractual relationships it enjoyed with its customers. Defendant responds the claim must fail because the circular was "mailed . . . only to . . . [defendant's] . . . West Virginia customers." (Def.'s Memo. in Supp. at 12.) Defendant relies upon the rule that "[i]t is impossible for one party to a contract to maintain against the other party to the contract a claim for tortious interference with the parties' own contract . . . ." See, e.g., Syl. pt. 1, Shrewsbery v. National Grange Mut. Ins. Co., 183 W. Va. 322, 395 S.E.2d 745 (1990).

---

   [3](...continued)
Tiernan v. Charleston Area Medical Cntr., 203 W. Va. 135, 148-49, 506 S.E.2d 578, 591-92 (1998) (quoting Syl. Pt. 2, Torbett, 173 W. Va. 210, 314 S.E.2d 166).

If, however, as plaintiff claims, any of the former Kesler/defendant customers validly terminated their contracts because of service issues, and then became plaintiff's customers, the legal authority cited by defendant would be of little assistance. In such a situation, plaintiff may have a viable tortious interference claim. In view of this consideration, the record is underdeveloped on the point. The court, accordingly, ORDERS that defendant's motion for partial summary judgment as to plaintiff's tortious interference claim be, and the same hereby is, denied.

### 2. Defamation

The elements of defamation are (1) defamatory statements; (2) a non-privileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury. Syl. Pt. 1, <u>Crump v. Beckley Newspapers</u>, 173 W. Va. 699, 699, 320 S.E.2d 70, 70 (1983). Defendant contends the defamation claim fails as a matter of law because (1) plaintiff is not identified by name in the circular, (2) much of the circular is true, and (3) defendant was not even aware that plaintiff was the perpetrator attempting to solicit its formerly Kesler customer base. Plaintiff responds (1) the circular was mailed shortly

after it began contacting the targeted customers, and (2) plaintiff is the ascertainable target of the circular.

In the court's May 11, 2004, order denying defendant's motion to dismiss, it is noted that "[w]hether the defamatory words . . . refer to [plaintiff] is a question . . . normally to be resolved by the trier of fact . . . ." <u>Secure US, Inc. v. Security Alarm Financing Enterprises, Inc.</u>, No. 2:04-0252, slip op. at 10 (S.D. W. Va. May 11, 2004).  The truth of the circular, and defendant's awareness of plaintiff's marketing activities, are subject to the same observation.  These quintessential factual determinations will be resolved by the court based upon the complete record at trial.

The court, accordingly, ORDERS that defendant's motion for partial summary judgment as to plaintiff's defamation claim be, and the same hereby is, denied.

### III.

Based upon the foregoing, the court ORDERS that defendant's motion for partial summary judgment be, and the same hereby is, denied.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: April 22, 2005

John T. Copenhaver, Jr.
United States District Judge