```
            UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON


SECURE US, INC.,
a West Virginia corporation,

     Plaintiff

v.                              CIVIL ACTION NO. 2:04-0252

SECURITY ALARM FINANCING
ENTERPRISES, INC., a corporation,

     Defendant
```

## MEMORANDUM OPINION AND ORDER

On November 21 and 22, 2005, the court conducted a bench trial in this action.  On December 30, 2005, the defendant/counter claimant, Security Alarm Financing Enterprises, Inc. ("SAFE"), submitted its revised proposed findings of fact and conclusions of law.  On January 3, 2006, the plaintiff/counter defendant Secure US, Inc. ("Secure US"), submitted its post-trial proposed findings of fact and conclusions of law.  On January 10, 2006, SAFE submitted its supplemental revised proposed findings of fact and conclusions of law to which Secure US filed its objection on February 2, 2006.

I.  FINDINGS OF FACT


The following discussion represents the court's findings of fact as to liability.  Each finding is made by a preponderance of the evidence.


A.  The Parties


Secure US is a West Virginia corporation located in Morgantown.  (Jt. Stip. ¶ 1).  Secure US, <u>inter</u> <u>alia</u>, sells, installs, and monitors residential and commercial security systems in West Virginia.  (<u>Id.</u> ¶ 2).  Secure US was founded by Mitchell Brozik in approximately 1995. (Trial Trans. at 47) (hereinafter "Tr. at ____ ").  Mr. Brozik and his office manager, Sheila Hunt, testified at trial on behalf of Secure US.  (Tr. at 47, 145).

SAFE is a corporation with its principal place of business in San Ramon, California.  (Jt. Stip. ¶ 3).  SAFE was founded in 1988 by Paul Sargenti.  Mr. Sargenti, SAFE's primary witness at trial, holds doctoral degrees in economics and history from the University of California and has been qualified as an

2

expert witness in multiple jurisdictions on the issue of damages in the security monitoring industry.  (Tr. at 184-85).  The court finds that Mr. Sargenti possesses specialized knowledge, skill, experience, training, and education in the security monitoring and finance industry generally, beyond that of any other witness or party who testified in the case.

Since the time of its founding, SAFE has been engaged in, inter alia, acquiring contracts and monitoring residential and commercial security systems in 44 states including West Virginia.  SAFE performs these actions either directly or through arrangements with third parties.[1]  (Tr. at 186-87).  SAFE is the only security monitoring company in the United States that has successfully issued securitized bonds in public markets.  (Tr. at 186).  These bonds are secured by various portfolios made up of SAFE's underlying security monitoring contracts.  (Tr. at 187).  The last securitized portfolio issued by SAFE received a Triple A rating or its equivalent from Moody's and Standard & Poor's.  (Tr. at 187).

---

[1]SAFE, through its apparent subsidiary, SAFE Financial, is also involved in a joint venture with GE Capital to assist dealers with liquidity needs.  (Tr. at 206).  SAFE Financial has approximately $160,000,000 in "outstanding . . . debt provided to security alarm dealers."  (Tr. at 206).

3

Prior to purchasing customer accounts represented by a security monitoring contract, such as those discussed herein that were acquired in West Virginia, SAFE undertakes significant due diligence designed to examine the economic strength and general viability of the underlying security monitoring contracts.  SAFE does so to avoid extraordinary account attrition, an event that might result in a default under its securitized bonds or an erosion of the bonds' Triple A rating.  (Tr. at 186-88).

B.   SAFE'S Foray Into West Virginia

SAFE entered the West Virginia market on November 9, 1999, through a series of transactions with Kesler Communications, Inc. ("Kesler").  (Def.'s ex. 4 at 1).  Kesler was formerly a security system provider situated in southern West Virginia.  (Tr. at 207).  Between 1999 and 2003, SAFE and Kesler entered into a number of "RMR Account Purchase Agreements." (Tr. at 213-14).  SAFE purchased from Kesler a total of 2,316 customer accounts representing $73,573.79 of recurring monthly revenue ("RMR") during the four year span.  (Tr. at 213-14; Def.'s ex. 4).[2]  SAFE's last acquisition of accounts from Kesler occurred in

---

[2]The term "RMR" is used within the security monitoring industry to represent the recurring monthly revenue that a security monitoring company receives from its customers.

4

mid-April 2003.  (Tr. at 275).  SAFE paid in excess of $2.1 million to Kesler for this RMR.  (Tr. at 214).  The relationship between SAFE and Kesler's customers created by these RMR Account Purchase Agreements are hereinafter referred to as "SAFE's contracts."

The purchase price for the RMR, paid by SAFE up front in anticipation of a future payment stream of RMR, was financed by SAFE through third party lenders.  (Tr. at 215).  The SAFE contracts, which are deemed equivalent to the customer accounts acquired from Kesler, were pledged by SAFE to its lenders as collateral for the third-party loans.  (Tr. at 203-04; 215).  SAFE remains liable on these loans, regardless of whether it actually receives from its customers their RMR for which it contracted with Kesler.  (Tr. at 203-04; 215).

SAFE and its lenders undertook rigorous and detailed due diligence prior to acquiring the West Virginia accounts. (Tr. at 193-97; 208-09).  The lenders then performed annual audits thereafter.  (Tr. at 193-97; 208-09).  This due diligence was directed at a number of concerns, including the dealer's record and reliability and the customer's satisfaction with the dealer. (Tr. at 194, 197).  Mr. Sargenti testified that SAFE did not accept the assignment of any Kesler security monitoring contract that failed the due diligence investigation.  (Tr. at 210).

The objective evidence demonstrates that SAFE's due diligence protocol bears fruit.  The national, average life span of a security monitoring contract is 7.8 years; the same measurement for a SAFE security monitoring contract is said to be 11.23 years.  (Tr. at 200).  For these reasons, the court finds that the underlying West Virginia security monitoring contracts assigned by Kesler to SAFE were of sound quality.

C.   Secure US's Acquisition of Certain Kesler Assets

Secure US desired to expand its operations to the southern part of West Virginia, particularly the Charleston area.  (Tr. at 49).  Kesler unexpectedly left the security alarm business sometime between May and early June 2003.  (Tr. at 344-46).  In June 2003, Secure US agreed to purchase certain furniture, office equipment, and other assets from Kesler for approximately $20,000.  (Tr. at 54-55, 100).  The Kesler assets were located in a leased building in Charleston.  (Tr. at 55).

Kesler was experiencing financial difficulties at the time, which included back rent owed to its existing lessor.  (Tr. at 55).  In June 2003, Secure US moved Kesler's physical assets

6

to its headquarters in Morgantown.  (Tr. at 55).  Among the moved assets were Kesler's filing cabinets, not because of what they were, but rather what they contained -- the existing SAFE contracts.  (Tr. at 67, 158).  The filing cabinets, with the SAFE contracts inside, were placed in Secure US' Morgantown office basement.  (Tr. at 56, 67).  Although the filing cabinets were purchased, the contracts were not.  (Tr. at 158).  SAFE was unaware at the time that Kesler had abandoned the market or that Secure US had acquired either the SAFE contracts or other assets from Kesler.  (Tr. at 275-76).

In addition to the tangible physical assets described above, Secure US also purchased Kesler's various business telephone numbers, including its yellow pages listing.  (Tr. at 54-55).  As a result, current SAFE customers and other, prospective customers attempting to contact Kesler were re-routed to Secure US.  (Tr. at 56-57).

Kesler transferred the phone numbers to Secure US notwithstanding a provision in the RMR Account Purchase Agreements which prohibited Kesler from assigning the numbers without SAFE's express consent.  (Def.'s ex. 3 ¶ 6.12; Tr. at 272, 76).[3]  The court finds that it was SAFE's intention to

---

[3]In addition to protecting the phone lines in this manner, SAFE additionally placed the general public on notice that it had
(continued...)

acquire these phone numbers for its own account and protect them from misuse by others in the event that the security system dealer --in this case Kesler-- vacated the market.  (<u>Id.</u>) The court additionally finds that Secure US willfully failed to inquire concerning the lawful ownership of the phone numbers, intending to interfere with SAFE's contracts.  Secure US further ignored its obligation to ascertain the lawful owner of the numbers, instead focusing upon the number of additional commercial contacts it might harvest from the new telephone contacts.  (Tr. at 57).  Indeed, calls from SAFE's customers and others continued for several months.  (Tr. at 59).  The court finds Secure US's call-interception efforts, along with those other wrongful acts further described in sections I.E and I.F <u>infra</u>, directly and proximately caused the confusion and general

---

[3](...continued)
acquired customer accounts from Kesler by virtue of its filing of precautionary financing statements with the West Virginia Secretary of State.  (Tr. at 273).  Further, SAFE last had contact with Kesler in April 2003.  (Tr. at 351).  It spent approximately the next month trying to determine whether Kesler was in fact still in business.  (Tr. at 351).  SAFE did not wish to prematurely take the phone lines and expose itself to potential civil liability.  (Tr. 351-52).  When SAFE learned in June 2003 that Kesler was no longer a going concern, however, it set about promptly to secure the Kesler phone lines as provided in the RMR Account Purchase Agreements.  (Tr. at 351).  Upon contacting the telephone service provider, however, SAFE learned the telephone numbers had been re-assigned to another party. (Tr. at 351).

disturbance that ensued in varying degrees within the SAFE customer base up to at least October 2005.  (Tr. at 157, 190, 363).

Secure US was fully cognizant at the time it acquired the SAFE contracts in June 2003 that the customers represented thereon were then under contract with SAFE and that SAFE had paid considerable money to inherit the right to service the customers' security monitoring needs.[4]  (Tr. at 107, 110, 155; Jt. Stip. ¶ 10).  Despite this knowledge, Secure US took no action to disclose or otherwise notify SAFE that it had acquired the SAFE contracts.  (Tr. at 389-90).  Both Mr. Brozik and Ms. Hunt readily acknowledged that a security monitoring company's customer list and detailed customer account information constitute confidential and proprietary information.[5]  (Tr. at 110, 166-67).  The court consequently finds that Secure US knew that the SAFE contracts constituted SAFE's confidential and proprietary information and trade secrets.

-------

[4]It is also noted that, despite its best efforts, SAFE was unable to locate Kesler after May 2003.  SAFE rightly concluded that any legal action against Kesler would be fruitless.  (Tr. at 276).

[5]SAFE likewise considers such customer information to constitute  confidential and proprietary information and trade secrets.  SAFE also takes reasonable steps to protect the information from public disclosure, such as holding the documents in a secure area in its offices.  (Tr. at 205).

D.   Initial and Renewal Terms in Security Monitoring Contracts

        The SAFE contracts assigned by Kesler provided for,
<u>inter</u> <u>alia</u>, an initial term for years (typically three years) and
an automatic renewal provision, whereby the initial contract term
would automatically renew on a year-to-year basis unless the
customer chose to cancel. (Pl.'s ex. 6; Tr. at 94-96, 203-04).
The court finds public policy is best served by such renewal
terms in that they fairly balance the customer's right to cancel
with the equally salutary end of assuring uninterrupted security
monitoring in view of the life safety issues involved.  (Tr.
278-79).

        Such renewal terms are also considered critical by
SAFE's lenders in their decision to extend financing.  (Tr. 203-
04).  Based upon these and other considerations, the court finds
that automatic renewal provisions are standard in the security
monitoring industry and are currently in use by most, if not all,
security alarm companies throughout the state of West Virginia,
including SAFE and Secure US.

10

E.   Kesler Disappears and SAFE Services its West Virginia
     Customers

          The court finds Kesler provided acceptable service to,
and on behalf of, SAFE from the inception of the SAFE/Kesler
dealer program in 1999 through late April 2003.  (Tr. at 279,
344).  SAFE had, consistent with its usual business practice,
arranged for alternative service providers in the West Virginia
market in the event that Kesler became unable to fulfill its
service responsibilities.  (Tr. at 279-81; 345-47).

          SAFE learned of "a significant drop in performance
under the Kesler contract" in May or June of 2004.  (Tr. at 275).
Secure US contended that it was justified in soliciting SAFE's
West Virginia customers because of the alleged service problems
the customers were experiencing.  Secure US failed, however, to
present testimony or documentation from affected customers to
corroborate its service-failure allegations or to overcome SAFE's
evidence to the contrary.

          The record reflects that SAFE referred its customers to
the alternate service providers whenever it was contacted by them
for service issues arising as early as May 2003.  (Tr. at 346-47,
352-353).  The court further finds that Secure US did not

11

undertake diligent efforts to re-direct former Kesler customer inquiries to SAFE. Secure US's failure in this regard was based, in part, upon its desire to capitalize on the SAFE contacts for its own account.

F.   Secure US's Systematic Solicitation of SAFE's Customers

In addition to its use of the Kesler/SAFE telephone lines and listings for its own benefit[6], Mr. Brozik additionally began mining the SAFE contracts as part of a systematic effort to solicit and interfere with the SAFE customer base. (Tr. at 59-60). Secure US began creation of a spreadsheet on September 15, 2003, based upon the SAFE customer's name, address, phone number, monthly monitoring fee, and contract expiration date. (Tr. at 61; Pl.'s Ex. 1). The spreadsheet was organized chronologically, with those contracts set to expire first coming at the beginning of the spreadsheet. (Tr. at 66).

In order to maximize the benefit from the taken SAFE contracts, Secure US hired Cheryl Sober, a former Kesler employee

---

[6]Mr. Brozik testified concerning the level of interference with SAFE's customer base that resulted from the transferred phone lines: "We had so many calls of people that had wanted to leave and had converted to us at that time, that we decided there was probably an opportunity for a lot more customers to be obtained." (Tr. at 61).

familiar with the customer base.[7]   (Tr. at 67).  Ms. Sober

offered her services to Secure US as a "telemarketer."  (Tr. at

67).  Ms. Sober was paid a base salary and a commission for each

SAFE customer she successfully converted to Secure US.  (Tr. at

165).  Ms. Sober's efforts resulted in Secure US successfully

purloining 170 SAFE customers.[8]   (Tr. at 71; Pl.'s Ex. 2).

_____

[7]The parties stipulate that Ms. Sober was an independent
contractor.  (Jt. Stip. ¶ 12).  As noted recently by the West
Virginia Supreme Court of Appeals, the "'seminal case
establishing the test for whether an independent contractor
relationship exists is Paxton v. Crabtree, 184 W. Va. 237, 400
S.E.2d 245 (1990).'"  Burless v. West Virginia University
Hospitals, Inc., 215 W. Va. 765, 771, 601 S.E.2d 85, 91 (2004)
(quoting Shaffer v. Acme Limestone Co., Inc., 206 W. Va. 333,
340, 524 S.E.2d 688, 695 (1999)).  Syllabus point 5 of Paxton
provides as follows:

> There are four general factors which bear upon whether
> a master-servant relationship exists for purposes of
> the doctrine of respondeat superior: (1) Selection and
> engagement of the servant; (2) Payment of compensation;
> (3) Power of dismissal; and (4) Power of control. The
> first three factors are not essential to the existence
> of the relationship; the fourth, the power of control,
> is determinative.

Paxton, 184 W. Va. at 240, 400 S.E.2d at 240.  Accepting the
testimony of Mr. Brozik for this limited purpose, Ms. Sober
contacted Secure US.  (Tr. at 67-68).  She was engaged, however,
by Secure US in a manner not befitting a true independent
contractor.  Ms. Hunt noted that Ms. Sober was a member of Secure
US's "sales staff."  (Tr. at 164).  Additionally, Ms. Sober was
paid a base salary and commission.  (Tr. at 165).  She was also
subject to termination in view of her status as a member of the
sales staff.  Further, and most importantly, the court finds
Secure US controlled the details of her work.  (See, e.g., Tr. at
71 (Mr. Brozik testifying to instructions given by Secure US to
Ms. Sober)).  The court, accordingly, rejects the parties'
stipulation on this narrow point.  Ms. Sober served as an
employee of Secure US.

[8]Although Mr. Brozik testified that 171 customers switched,
plaintiff's exhibit 2 reflects only 170 converted customers.
                                        (continued...)

The court specifically rejects Secure US's contention that it acted properly in retaining and instructing Ms. Sober. The court finds that Mr. Brozik was not forthcoming concerning the actual instructions he provided Ms. Sober. For example, Mr. Brozik stressed that Ms. Sober was sent only that portion of the spreadsheet containing the names of SAFE customers in their renewal term. (Tr. at 68). It is undisputed, however, that Secure US solicited, and signed, some SAFE customers who were in their initial term. (Tr. at 117-18; Jt. Stip. ¶ 17). Additionally, Secure US failed to produce Ms. Sober at trial, and there was no indication that she was available to be called by SAFE. Contrary to the testimony of Mr. Brozik and Ms. Hunt, the court finds Ms. Sober was encouraged, both implicitly and explicitly, to convert as many of SAFE's customers as possible.

Secure US attempts to defend its solicitation of SAFE's customers by contending, inaccurately, that it only contacted those customers who were in their renewal term. The court finds

---

[8](...continued)
(Pl.'s ex. 2). Further, plaintiff's exhibit 3 reflects 30 individuals who signed contracts with Secure US but who later cancelled, some putatively as a result of SAFE retention efforts. (Pl.'s ex. 3). The court notes that only 3 of the cancelling individuals, Cooper, Bender, and Wright, listed on exhibit 3 appear on the list of 170 reflected by exhibit 2. (Compare Pl.'s ex. 2, with Pl.'s ex. 3). The court attributes the dissonance to inaccurate record keeping on the part of Secure US.

14

Secure US's putative justification to be meritless for a host of reasons. First, Secure US concedes, through Ms. Hunt, that the rights and obligations of both the security monitoring company and the customer do not change from the initial term to the renewal term. (Tr. at 171-72; Jt. Stip. ¶¶ 14-15).

Second, Secure US failed to rebut Mr. Sargenti's testimony that customers are typically insensitive to the expiration of their initial term and that expiration of the initial term is not typically followed by an attrition spike. (Tr. at 278).

Third, Secure US's argument that renewal terms are unenforceable is belied by its own continued use of such provisions in its standard customer contract, along with its failure to suggest to its customers that such provisions are unenforceable. (Def.'s ex. 2; Tr. at 169-70; see Jt. Stip. ¶ 8).

Fourth, Secure US produced a letter from the Office of the Attorney General of West Virginia upon which it bases, in part, its conclusion that renewal terms are unlawful. (Pl.'s ex. 5). The letter, however, states the opposite, noting that such provisions are not "inherently unlawful . . . ." (Pl.'s ex. 5 at 1).

15

Fifth, as noted, Secure US admits that it actually solicited, and signed, SAFE customers in their initial term, despite detailing on its spreadsheet precisely when each SAFE customer's initial term expired.  (Tr. at  117-18; 416-17; Joint Stipulations ¶ 17).

Beyond these five considerations, however, the court finds the Secure US solicitation to have been contrary to law for two additional reasons.  First, Secure US's solicitation of SAFE's customer base by misappropriation and misuse of SAFE's confidential and proprietary security monitoring contract information is improper without regard to when the solicitation occurred.  Second, Secure US's solicitation of SAFE's customer base included false statements and deception, again improper without regard to when in the contract term the solicitation occurred.

This finding, relating to Secure US's use of false statements and deception, is supported, in part, by the testimony of Evelyn Bledsoe, Carol Garretson, Judy Lewis, and Mary Knolley. These individuals -- each of whom are SAFE customers or close relatives of customers -- received unsolicited phone calls from a Secure US representative in approximately late 2003 or early

16

2004.  (Tr. at 225, 238-39, 258-59).  The phone calls included
false and defamatory statements concerning SAFE.

Ms. Bledsoe stated the Secure US representative
informed her that SAFE had gone out of business in West Virginia
and that Secure US was "taking over their customers."  (Tr. at
226).  Ms. Bledsoe and her husband were sent a contract by Secure
US following the phone conversation.  (Tr. at 226).  Ms. Bledsoe
was contacted again by Secure US after she had discussed the
deceptive communication with SAFE.  She explained the content of
that second communication with Secure US:

> [The Secure US representative] said that she
> hadn't received the contract from us, and I told her we
> decided to stay with SAFE.  She said, "You've got to be
> kidding," just about that way.  And I told her, "No, we
> had contacted them and decided to stay with them."  And
> she got a bit argumentative, and I said, "Well, we're
> staying with the same company," [and I hung up] . . . .

(Tr. at 228).

Ms. Garrettson was told that SAFE was no longer
servicing contracts and lacked West Virginia personnel.  (Tr. at
239).  She too was sent a contract by Secure US, which she
destroyed after phoning SAFE and learning the true state of
affairs.  (Tr. at 239-40).

Ms. Lewis encountered Secure US after visiting her
mother's home and finding her upset.  (Tr. at 248).  Her mother,

17

an elderly woman, had been called by Secure US and informed that her security system did not work. (Tr. at 248). When Ms. Lewis phoned the number her mother was given, the Secure US representative attempted to switch her from SAFE that very evening. (Tr. at 249). The Secure US representative informed Ms. Lewis that the switch had to occur quickly because her security system was not being monitored. (Tr. at 250).

Ms. Knolley was informed by Secure US that she was going to "lose . . . [her] contract . . . ." (Tr. at 259-60). She was additionally advised that SAFE (1) was going out of business and (2) would no longer service her security monitoring system. (Tr. at 259-60). The caller persisted in attempts to cause Ms. Knolley to switch her security monitoring service to Secure US. (Tr. at 259-60).[9]

The false and defamatory statements are thus well supported in the record. The court additionally finds that the

_____

[9]Ms. Knolley suggested during her direct examination that the Secure US representative who phoned her was a male. (Tr. at 260). Secure US places great stock in this assertion, given its contention, discussed in the next subsection, that other security monitoring companies were likewise interfering with SAFE's customer base at the time. The court notes, however, that Ms. Knolley later replied "I can't remember" when asked specifically about the gender of the caller. (Tr. at 260). It is more reasonable to infer, and the court so finds, that Ms. Knolley was mistaken concerning the gender of the individual that contacted her from Secure US.

18

statements were made by an authorized Secure US representative
and were purposefully designed to fraudulently convince SAFE
customers to enter into a security monitoring contract with
Secure US.  The court further finds, based on reasonable
inference, that the other SAFE customers contacted by Secure US
received the same or a similar false and defamatory sales
presentation.[10]

G.   Alleged Third-Party Interference

        Secure US and SAFE both contend that other security
monitoring entities were actively soliciting SAFE's customers
during the relevant time period.  SAFE asserts that three
companies, including Secure US, were responsible for the
interference.  The court so finds.  Secure US, with little
evidentiary development, further asserts that these other two
entities are responsible for a material portion of SAFE's West
Virginia account attrition, which the court finds radiated

_____

        [10]Each of the four customer witnesses contacted SAFE after
receiving the uninvited Secure US solicitation.  (Tr. at 225,
240-41, 250-51, 260).  After doing so, they were satisfied that
Secure US lied to them.  (Tr. at 227, 240-41, 250-51, 261).  Each
customer witness also testified that they were satisfied with the
level of service received from SAFE.  (Tr. at 228, 241, 251-52,
261).

19

through the account base and extends well beyond the 203 identified Kesler accounts that were purloined from SAFE, of which 170 are attributed to Secure US. (See, e.g., Tr. at 80-81).

Mr. Sargenti acknowledges that he contacted, in addition to Secure US, the other two entities that his Kesler customers described as companies that interfered with their relationship with SAFE. (Tr. at 285). One of those two was Titan Security ("Titan") whose principals consisted of William Steele and Jeff Priest, two former Kesler employees. (Tr. at 360-61). Titan converted 30 of SAFE's customers. At some undisclosed time all but about four were returned to SAFE when SAFE threatened suit. (Tr. at 383-84). Somewhat similarly, 30 of the 170 Secure US accounts were cancelled or returned to SAFE.

The second entity, Monitronics, is a national company based in Dallas, Texas. It acquired 3 Kesler/SAFE customers from a dealer who was a former employee of one or more alarm companies in West Virginia. (Tr. 357-58). For simplicity sake, the court will refer to this third of the three interfering entities as Monitronics, though its dealer was the one responsible for the interference.

20

In ascertaining the respective levels of interference caused by Secure US, Titan, and Monitronics and reflected in the total disturbance of SAFE's Kesler accounts, the court begins with the fact that SAFE's West Virginia customer base, as noted, consisted of 2,316 accounts.  The court has found that Secure US contacted 1,290 SAFE customers.  (Tr. at 85, 398).  As earlier noted, Secure US obtained 170 SAFE accounts.  (Pl.'s Ex. 3; see Tr. at 87).  Based solely upon Secure US' telemarketing efforts through Ms. Sober then, Secure US is responsible for a 56% interference rate (1,290 telemarketing calls/2,316 customer base).  Secure US' success rate in converting SAFE customers through active conversion efforts can thus be said to approximate 13% (170 accounts converted/1,290 telemarketing calls).

Respecting Titan, the matter is more complicated inasmuch as the record does not reflect the number of SAFE customers that it contacted.  There is a reasoned method, however, for deriving this number from the record in an approximate manner.  If one attributes to Titan the same customer-conversion success rate of 13% achieved by Secure US, it can be inferred that Titan contacted 231 SAFE customers.  This rounded number is reached by operation of the following equation: $30/x = .13$.  One may then calculate the interference rate to be approximately 10% (231 customer contacts/2,316 customer base).

Respecting the three accounts converted by Monitronics, and following the same methodology, its dealer's efforts resulted in 23 SAFE customers being contacted (3/x = .13), with a 1% interference rate (23 customer contacts/2,316 customer base).

The combination of the three foregoing interference rates of Secure US (56%), Titan (10%), and Monitronics (1%), results in a sum of percentages of 67%. The court attributes the residual 33% in the same proportions as the 56%, 10% and 1% bear to each other. This attribution results in the allocation of an additional 27.75% to Secure US, 4.75% to Titan and .5% to Monitronics. Thus, the total interference rate attributed to each becomes: Secure US 83.75%, Titan 14.75% and Monitronics 1.5%.[11]

_____

[11]With the benefit of the background set forth in the text of section I.G, this same result may be achieved by a simpler method as follows:

|  | Accounts Converted | Percentage of Accounts Converted |
|---|---|---|
| Secure US | 170 | 83.75% |
| Titan | 30 | 14.75% |
| Monitronics | 3 | .50% |
| Total | 203 | 100.00% |

H.    The SAFE Postcard Circular, Mr. Sargenti's Courtesy Call to
      Mr. Brozik, and the Inception of this Litigation

        SAFE became aware by late 2003 that some person or
entity was systematically and substantially soliciting, and
otherwise materially interfering with, its West Virginia customer
base.  (Tr. at 281-82, 284-85).  SAFE learned, inter alia, that
its West Virginia customers were being solicited through "cold
call[]" claims that SAFE was no longer in business, was going
bankrupt, and was no longer monitoring customer security systems.
(Tr. at 281-82, 294-95, 363).

        The interference was creating, inter alia, a "double
liability" problem for SAFE's customers, placing them in the
troublesome position of being committed, and potentially liable,
to two separate security alarm companies.  (See Tr. at 295).
Inasmuch as customer confusion and account attrition was
continuing, SAFE, either at the end of December 2003 or the
beginning of January 2004, forwarded a postcard type circular to
its West Virginia customers reassuring them that SAFE was their
monitoring company and warning them that they should be wary of
scams which could, among other things, potentially lead to double
liability.  (Pl.'s ex. 4; Tr. at 286, 356).  SAFE had previously
used the same circular in other jurisdictions.  (Tr. at 287).

                              23

In January 2004, after the circular had been disseminated, Mr. Sargenti contacted Mr. Brozik and asked him to cease and desist.  (Tr. at 286).  Mr. Brozik responded that "he had no intention of stopping[,]" even after Mr. Sargenti threatened a tortious interference lawsuit against Secure US. (Tr. at 286).

Not long after dissemination of the circular, however, Secure US came to believe in April 2004 that its continued efforts to solicit SAFE's customers would be unfruitful.  The active interference ceased at this time.

On February 17, 2004, plaintiff instituted this action in the Circuit Court of Kanawha County, alleging claims for tortious interference and defamation.  Secure US concedes that the entirety of its claims in this action are premised solely upon the alleged misstatements contained in the circular.  (Tr. at 116, 126).  On March 19, 2004, defendant removed on both diversity and federal question grounds.  Defendant filed a counterclaim for (1) defamation, (2) tortious interference, and (3) common-law unfair competition.[12]

---

[12]The court notes the absence of any discussion of the common-law unfair competition claim in SAFE's proposed findings of fact and conclusions of law.  The court, accordingly, treats the claim as abandoned.

## II. FINDINGS CONCERNING WITNESS CREDIBILITY

A.   Mr. Brozik

The court finds Mr. Brozik lacking in credibility on a number of disputed issues of fact in this action.  The court discusses below six examples.

First, Mr. Brozik testified that he believed renewal terms were unenforceable in West Virginia.[13]  (Tr. at 99).  This conclusion was ostensibly based upon oral and written communications he had with the Office of the Attorney General. (Tr. at 134).  Although Mr. Brozik testified to his beliefs concerning the unenforceability of renewal terms, Secure US, even up to the time of trial, continued to include such terms in its security monitoring contracts.  He attempted to explain this non-sequitur by claiming that Secure US treats the renewal terms as month-to-month obligations.  (Tr. at 419).  The court, however, finds Mr. Brozik's professed views concerning renewal terms to

---

[13]Mr. Brozik also testified that Secure US corresponded on one occasion with SAFE in January 2004 to inquire whether Secure US's contacts with existing SAFE customers were deemed improper in any way.  (Tr. at 134-35).  The letter was not admitted into evidence and hence is entitled to no weight in the court's analysis.

have been formed by him for the purpose of justifying Secure US's contacts with SAFE customers during their renewal terms.

Second, Mr. Brozik, in an additional attempt to buttress his renewal-term testimony, suggested that he had been aware of the unenforceability of renewal terms for a period of 9 years.  When asked on cross examination why Secure US continues to insert the renewal-term language in its security monitoring contracts, a contract used in its same form by Secure US for a decade (Tr. at 168), Mr. Brozik explained his entity was in the process of updating the contracts "right now" with the Office of the Attorney General.  (Tr. at 419).  Counsel for the defendant noted this same response was given by Mr. Brozik during his deposition over a year prior to trial.  Mr. Brozik responded simply that the update process was still underway.  (Tr. at 419-20).  Of considerable moment in this regard, however, was the testimony of Ms. Hunt, the "nerve center" for Secure US, professing her unawareness of any effort to change the Secure US contract language. (Tr. 169-70).  Mr. Brozik failed to explain why Secure US had yet to remedy a supposedly serious consumer protection issue within its security monitoring contract, despite the passage of nearly a decade in which to do so.

Third, Mr. Brozik was asked on direct examination if he would have used the Kesler telephone lines and SAFE contracts had he been in possession of the actual RMR Account Purchase Agreements executed by Kesler and SAFE. (Tr. at 60). He responded as follows: "I think SAFE had the responsibility of controlling who got their hands on their contracts and what happened with the phone lines." (Tr. at 60). It is undisputed that Mr. Brozik knew at the time he acquired the SAFE contracts that the vast majority of Kesler's monitoring obligations had been assigned to SAFE. (Jt. Stip. ¶ 10). Mr. Brozik was additionally aware of the sensitive nature of the contracts, noting he protects this type of "proprietary" and "confidential" information as it relates to Secure US customers. (Tr. at 110). In responding to the aforementioned query, Mr. Brozik failed to acknowledge that the manner in which he obtained possession of the contracts, stored in a filing cabinet acquired at a "fire sale" of physical assets, was wholly distinguishable from a situation where SAFE might have inadvertently disclosed the critical business information which he took, mined, and then misused.

Fourth, Mr. Brozik testified that the customers Secure US converted were the product of Ms. Sober's efforts along with

27

some who "called the Kesler lines and said sign me up, I'm very disgusted, disappointed, blah blah blah, with my current situation, and I want to convert with someone that has a local presence that can handle me."[14]  (Tr. at 118, 71).  Despite ample opportunity to do so, Mr. Brozik failed to identify a single individual converted by Secure US as a result of the type of voluntary telephone contact Mr. Brozik described.  Additionally, Secure US produced no one to substantiate Mr. Brozik's account.

Fifth, Mr. Brozik noted during his direct examination that Ms. Sober "was an independent contractor that we paid by a piecemeal basis."  (Tr. at 67-70).  Ms. Hunt, a sequestered witness, later observed during her cross examination that Ms. Sober was paid on commission "and a base salary as well." (Tr. at 165).  When called anew during SAFE's case in chief, the apparent contradiction was brought to Mr. Brozik's attention, an exchange set forth below:

> Q.  Let's talk about Cheryl Sober for a little bit.
> You hired Cheryl Sober to contact the customers that
> were contracted with SAFE, correct?
>
> A.  That's correct.  I didn't hire her, she was an
> independent contractor.  Let me say that.  I paid her
> on a subcontract basis to do it.  She was never an
> employee of Secure US.

---

[14]Although the court ultimately struck this testimony from a substantive perspective after objection, it is proper to consider the utterance for purposes of weighing Mr. Brozik's credibility.

28

> Q.  Did she have a base salary and a commission for
> every contract that she was able to convert from SAFE
> to Secure US?
>
> A.  I don't know that I would call it a base salary.
> She had some sort of -- I believe it was a fee that we
> called it.  Then we gave her a commission for
> conversions.
>
> Q.  How was the fee separate from a base salary?
>
> A.  Because we did not take taxes.  She had a
> subcontract agreement.
>
> Q.  But you paid her something on a base level and then
> you paid her a kicker.
>
> A.  Again, I wouldn't call it a base.  I believe it was
> a fee is what I would refer to it as, to cover her
> phone cost and her various expenses.

(Tr. at 392).  Confronted with the truth concerning the salary

paid to Ms. Sober, Mr. Brozik never explained the direct

contradiction between his testimony during Secure US's case in

chief and the information unwittingly supplied by Ms. Hunt.  This

direct contradiction is of some moment, given Mr. Brozik's

repeated attempts to characterize Ms. Sober as an independent

contractor.  (Tr. at 67, 392, 430).

Sixth, at a time when Mr. Brozik was testifying as to

when Kesler went out of business, he stated as follows:

> [W]e had heard, it had come down through the lines,
> that Mr. Kesler's agreement with SAFE had been
> terminated due to the fact that Mr. Kesler had been --
> was -- I understand that they were forging bank scores,

credit scores in order to finance the alarms. (Tr. at 50). The testimony appears to have been designed to undermine SAFE's contentions in the case that it undertook significant due diligence efforts prior to purchasing dealer accounts. Having expressed his understanding that some unknown portion of the SAFE accounts were tainted by fraud on a matter so important as credit history, Mr. Brozik never explained why Secure US so aggressively pursued these same SAFE customer accounts. Indeed, just a short time thereafter he professed that the contracts represented "an opportunity for a lot more customers to be obtained." (Trans. at 61).

The court finds the testimony of Mr. Brozik to be of diminished credibility.

B.   Ms. Hunt

Ms. Hunt testified primarily concerning the volume of calls that were received by Secure US after the Kesler phone line and listing were taken by Secure US.[15] There are a variety of

---

[15]The court finds the increased volume of calls, especially those relating to service and alarm events, to have been overstated by both Mr. Brozik and Ms. Hunt. The court instead credits Mr. Sargenti's testimony that SAFE engaged other dealers
(continued...)

considerations that impact Ms. Hunt's credibility.  First, she
conceded that she did not personally take the subject calls,
which were instead fielded by Lisa Barnett, her assistant.  (Tr.
at 149).  Second, Ms. Hunt at times had difficultly recollecting
key events in the case.  For example, she thought the Kesler line
and listing were transferred to Secure US in January 2003, a date
lacking any basis in the record and coming six months prior to
the transfer of Kesler's assets to Secure US.  (Tr. at 149 ("I
want to say it was January [2003].  It was at the very beginning
of the year.").  Third, Ms. Hunt appeared at times to be
motivated by a desire to protect Mr. Brozik, her employer's CEO.
For example, she stated on cross examination that the SAFE
contracts were inspected only by Tia Hunt.  (Tr. at 160).
Immediately after making that statement, the following exchange
ensued:

> Q.  I will tell you, Ms. Hunt, at your deposition, you
> indicated that Mitch Brozik had personally reviewed and
> analyzed those contracts, and I'm just going to ask you
> if that refreshes your recollection as to whether Mr.
> Brozik had also taken a look at those contracts as
> well?
>
> A.  I apologize.  I don't -- I don't know that to be
> true.

---

[15](...continued)
to begin servicing the West Virginia SAFE customers after April
2003.  (Tr. at 280).  Mr. Sargenti noted SAFE service records
showing service purchase orders being filled out in May 2003
continuously through the period.  (Tr. at 280).

(Tr. at 160-61).  For these reasons, the court finds Ms. Hunt's credibility to be somewhat diminished.


C.   Mr. Sargenti


        The court credits Mr. Sargenti's testimony as it relates to the disputed issues of material fact in this action. Mr. Sargenti's demeanor during his testimony was forthright and the product of what appeared to be deeply held convictions concerning the damage done to SAFE.  As will be noted, the court differs with Mr. Sargenti concerning the proper amount of damages to be awarded.  Some damage categories have not been proven by a preponderance of the evidence.  This finding, however, does not in any way diminish the court's general finding concerning Mr. Sargenti's credibility on the other factual issues in the case.


D.   Ms. Bledsoe, Ms. Garretson, Ms. Lewis, and Ms. Knolley


        The court credits the testimony of Ms. Bledsoe, Ms. Garretson, Ms. Lewis, and Ms. Knolley.  Each of these witnesses appeared concerned only with truthfully recounting their involvement in the events leading up to this action.  The witnesses were disinterested, and their demeanor was sincere,

forthright, and candid in all respects.  Their testimony, except
where otherwise specifically indicated, has been fully credited.

### III. CONCLUSIONS OF LAW

A.   Governing Law

  1.  Tortious Interference with a Business Relationship

        In order to establish a claim for tortious interference
with a business relationship, the proponent must prove four
elements by a preponderance of the evidence as follows:

  (1) existence of a contractual or business relationship
  or expectancy;

  (2) an intentional act of interference by a party
  outside that relationship or expectancy;

  (3) proof that the interference caused the harm
  sustained; and

  (4) damages.

Kessel v. Leavitt, 204 W. Va. 95, 138, 511 S.E.2d 720, 763 (1998)
(quoting Torbett v. Wheeling Dollar Sav. & Trust Co., 173 W. Va.
210, 314 S.E.2d 166 (1983)).  The West Virginia Supreme Court of
Appeals has additionally noted as follows in Tiernan v.
Charleston Area Medical Center, 203 W. Va. 135, 506 S.E.2d 578

(1998):

> "If a plaintiff makes a prima facie case, a defendant
> may prove justification or privilege, affirmative
> defenses. Defendants are not liable for interference
> that is negligent rather than intentional, or if they
> show defenses of legitimate competition between
> plaintiff and themselves, their financial interest in
> the induced party's business, their responsibility for
> another's welfare, their intention to influence
> another's business policies in which they have an
> interest, their giving of honest, truthful requested
> advice, or other factors that show the interference was
> proper."

Id. at 148-49, 506 S.E.2d at 591-92 (quoting syl. pt. 2, Torbett,
173 W.Va. at 210, 314 S.E.2d at 166).

By way of summary, the court finds that SAFE and its
customers were in the midst of contractual relationships in
November 2003.  Secure US interfered with these relationships by,
inter alia, contacting SAFE's customers and attempting by means
of false representations to persuade them to breach their
contracts with SAFE.  The interference by Secure US caused at
least 170 SAFE customers to sign up with Secure US for security
monitoring services, which directly and proximately caused
financial damage to SAFE.  The court further finds that Secure US
has no grounds to assert a defense of legitimate competition.
Secure US's unfairly competitive acts have no place in a lawfully
conducted marketplace.  The court, accordingly, concludes that
SAFE has proven its tortious interference claim by a
preponderance of the evidence.

34

As noted, Secure US's tortious interference claim is based solely upon the content of the circular. The circular, however, did not constitute an intentional act of interference with Secure US's purloined SAFE customers. Were it otherwise, however, SAFE's circular was privileged. The circular was a necessary, and entirely truthful and legitimate, tool utilized by SAFE to halt customer confusion, attrition, and potential double liability caused by Secure US's deceptive interference with SAFE's West Virginia customers.[16] The court, accordingly, ORDERS that Secure US's tortious interference claim be, and it hereby is, dismissed with prejudice.

---

[16]Although not necessary for purposes of dismissing Secure US's claim, the court additionally finds that the circular was generic in nature, failing to identify Secure US by name or inference. The same circular has been used by SAFE for a number of years to prevent similar poaching efforts in other jurisdictions. (Tr. at 287). Three other considerations are also noteworthy. First, SAFE limited the distribution of the circular to its own customers in West Virginia (Tr. at 114-15). Second, Ms. Hunt, Secure US's office manager and self-proclaimed "nerve center[,]" testified that she was unable to identify a single false statement in the circular. (Tr. at 147, 175-76). Third, and perhaps most importantly, Secure US failed to produce a single customer witness to corroborate Mr. Brozik's belief that any particular recipient of the circular was left with a false impression of Secure US.

2.  Defamation


        The supreme court of appeals has noted that there are

six essential elements to a successful claim for defamation as

follows:

> "The essential elements for a successful defamation
> action by a private individual are (1) defamatory
> statements; (2) a nonprivileged communication to a
> third party; (3) falsity; (4) reference to the
> plaintiff; (5) at least negligence on the part of the
> publisher; and (6) resulting injury."

Belcher v. Wal-Mart Stores, Inc., 211 W. Va. 712, 715, 568 S.E.2d

19, 22 (2002) (quoting syl. pt. 1, Crump v. Beckley Newspapers,

173 W. Va. 699, 699, 320 S.E.2d 70, 70 (1983)).  The West

Virginia court summed up the elements earlier, in Bine v. Owens,

208 W. Va. 679, 542 S.E.2d 842 (2000), as follows:

> "[T]o have a defamation claim, a plaintiff must show
> that false and defamatory statements were made against
> him, or relating to him, to a third party who did not
> have a reasonable right to know, and that the
> statements were made at least negligently on the part
> of the party making the statements, and resulted in
> injury to the plaintiff."

Id. at 683, 542 S.E.2d at 846.


        Regarding the first element, it has been observed that

"A statement may be described as defamatory 'if it tends so to

harm the reputation of another as to lower him in the estimation

of the community or to deter third persons from associating or

36

dealing with him.'"  Belcher, 211 W. Va. at 719, 568 S.E.2d at 26
(2002) (quoting Restatement (Second) of Torts § 559 (1977)).
Additionally, "[w]hether a written defamatory statement refers to
a particular plaintiff, normally, is a question of fact for a
jury."  Crump, 173 W. Va. at 703, 320 S.E.2d at 74 (quoting syl.
pt. 4, Neal v. Huntington Pub. Co., 159 W. Va. 556, 556, 223
S.E.2d 792, 792 (1976)).  Regarding the matter of privilege, it
was additionally noted in Crump that "'[t]he existence or
nonexistence of a qualifiedly privileged occasion . . . in the
absence of controversy as to the facts, [is a] question[] of law
for the court.'"  Crump, 173 W. Va. at 703, 320 S.E.2d at 74
(quoting syl. pt. 3, Swearingen v. Parkersburg Sentinel Co., 125
W. Va. 731, 26 S.E.2d 209 (1943)).

     Regarding SAFE's defamation claims against Secure US,
the first, third, and fourth elements are satisfied based upon
the court's earlier finding that Ms. Sober, Secure US's fully
authorized agent, made false and defamatory statements concerning
SAFE during her communications with its customers.  Additionally,
regarding the remaining elements, Secure US cannot claim the
benefit of any privilege for its intentional and injurious
actions.  The court, accordingly, concludes that SAFE has proven
its defamation claim by a preponderance of the evidence.

On the other hand, Secure US's defamation claim fails for a host of reasons.  As noted in the preceding subsection, the circular was a necessary, and entirely truthful and legitimate, tool utilized by SAFE to halt customer confusion, attrition, and potential double liability caused by Secure US's deceptive interference with SAFE's West Virginia customers.  These findings preclude Secure US from proving the elements of its defamation claim.  The court, accordingly, ORDERS that Secure US's defamation claim be, and it hereby is, dismissed with prejudice.

## IV.  FINDINGS ON DAMAGES AND INJUNCTIVE RELIEF

Having found for SAFE on its two substantive claims, the court additionally finds that SAFE has been damaged as a result of Secure US's misconduct.  As set forth more fully below, the court finds an award of both compensatory and punitive damages to be appropriate.  Both damage awards constitute the entirety of the damages to which SAFE is entitled on the two substantive claims it has alleged and pursued.

### A.    Compensatory Damages

As of June 1, 2003, SAFE's West Virginia accounts were producing $62,293.65 in RMR.  (Tr. at 296; Def.'s ex. 13 at 1).

The average attrition rate experienced by SAFE at that point was 19.89% annually and 1.66% monthly. (Tr. at 297; Def.'s Ex. 13 at 1). The court finds, however, that Secure US did not commence its active interference with SAFE's customer account base until November 2003.[17] The damage calculation thus begins with the November RMR figure of $57,299.73, a hard number produced by the SAFE accounting department and reflected in SAFE's primary damages summaries, SAFE's exhibits 13 and 21. (Tr. at 447; Def.'s ex. 13 at 1; Def.'s ex. 21). This figure is the amount of RMR that SAFE would expect, without adjustment for attrition, as of November 1, 2003. (Tr. at 296).

According to Mr. Sargenti, whom the court has previously found to possess specialized knowledge, skill, experience, training, and education in the security monitoring and finance industry generally, beyond that of any other witness or party who testified in the case, SAFE seeks four categories of damages. First, it seeks the cancelled RMR that resulted from Secure US's interference with its customers ("cancelled RMR damages" or "cancelled RMR"). (Tr. at 295). The court finds

---

[17]The court anticipated this possibility during trial. It is for this reason Mr. Sargenti was directed by the court to recalculate his proposed damage amounts based upon a first-interference date of November 1, 2003. (Tr. at 386). He did so. (See Exhibit 21).

this damage category to be based upon what SAFE would expect to receive from the cancelled accounts in a market transaction resulting in their sale to another entity.  SAFE seeks $489,460.65 for this category of damages.  (Def.'s ex. 21). Second, SAFE seeks the lost RMR stream from those cancelled accounts calculated from November 1, 2003, up to October 2005. (Tr. at 295; Def.'s ex. 13 at 3) ("lost RMR damages" or "lost RMR"). (Tr. at 295).  SAFE seeks $211,559.58 for this category of damages.  (Def.'s ex. 21).  Third, SAFE seeks the expenses it incurred as a result of Secure US's interference, specifically the provision of free service calls and free equipment to its customers.  These costs were presumably incurred by SAFE to promote goodwill and to encourage customer persistence after Secure US interfered with West Virginia's SAFE customer base ("goodwill damages"). (Tr. at 295; Def.'s ex. 21).  SAFE seeks $200,000 for this category of damages.  Fourth, SAFE seeks damages for loss of reputation, a calculation based upon a comparison of its expected and actual referral business from existing RMR ("referral damages").  (Tr. at 295).  SAFE seeks $125,583.08 for this category of damages.  (Def.'s ex. 21).

Regarding the first damage category, the cancelled RMR, the court refers to SAFE's exhibits 13 and 21.  Exhibit 21, and

the testimony that accompanied it, lists the figure of $57,299.73
in actual RMR as of November 1, 2003, a figure generated by the
SAFE accounting department from its West Virginia customer base
and not countered by Secure US. (Def.'s ex. 21). The figure
also appears in column 2 of SAFE exhibit 13 at 3 next to the date
"Nov-03[.]" (Def.'s ex. 13 at 3). The next column in SAFE's
exhibit 21, entitled "Pre-Interference Attrition Rate[,]"
represents Mr. Sargenti's proposed pre-interference attrition
rate of 19.89% annually and 1.66% monthly. (Def.'s ex. 21). The
proposed pre-interference rate was not disputed in any
significant way by Secure US and was not countered in any way by
expert or other suitable evidence.[18]   The court, accordingly,
finds SAFE's pre-interference attrition rates to be the product

_____

[18]Mr. Sargenti explained the derivation of the rate as
follows:

> We took from the period of inception of each group
> of contracts that we purchased from Kesler
> Communications a monthly attrition rate, which I
> believe averages about 1.66 percent, something like
> that, and it's the average of all the months, actually
> years in this case, of the attrition in that portfolio.

> We look at customer cancellations, RMR
> cancellations, dollar-on-dollar cancellations against
> the total amount that we purchased.

(Tr. at 301).  Mr. Sargenti additionally opined that his
calculation and use of the attrition rate, in essence a
regression curve, is standard in the industry.  (Tr. at 310).
The court so finds.

of a reasoned and generally acceptable calculation common to the security monitoring industry.

The third column of exhibit 21 lists the "Expected RMR 10/31/05[.]" (Def.'s ex. 21). This figure is the RMR SAFE would have expected monthly, concluding on October 31, 2005, taking into account its expected monthly attrition rate of 1.66% applied to an ever-attriting, and hence decreasing, monthly balance from the period between November 1, 2003, up through October 31, 2005.[19] The table in SAFE's exhibit 13 at page 3 proves up this calculation on a month-by-month basis.[20] (Def.'s ex. 13 at 3).

_____

[19]It is unclear why SAFE halted its monthly calculations at October 2005. It is reasonable to infer, however, that the trial in November 2005 prompted the October 31, 2005, stopping point. SAFE would not yet have generated its RMR figure for November 2005 at that point inasmuch as the month had not yet elapsed.

[20]Some extrapolation from the table found on page 3 of defendant's exhibit 13 is necessary in order to account for the court's finding that interference commenced in November 2003. Table 13 was generated by SAFE with the expectation the court would find a first-interference date of June 2003. SAFE exhibit 21 is a supplemental, revised set of calculations, however, to account for the court's request that the primary figures of SAFE's exhibit 13 be generated on the assumption of a first-interference date of November 2003.

For example, the third column of the table on page 3 of SAFE's exhibit 13, entitled "Gross Expected Ending RMR[,]" lists a figure of $38,366.00 for October 2005. (Def.'s ex. 13 at 3). Mr. Sargenti subtracted from this figure $1,815.00, a sum found in column five of that same exhibit to be the variance between the "Gross Expected Ending RMR" in column 3 and the "Actual Ending RMR" found in column 4 as of October 1, 2003. (Def.'s ex.
                                                    (continued...)

        The fourth column of SAFE's exhibit 21 is entitled

"Actual RMR 10/31/05[.]"  (Def.'s ex. 21).  The amount of actual

RMR at October 2005 was $22,566.00, a sum certain derived from

SAFE's accounting records which appears in the final cell of

column four on page 3 of SAFE's exhibit 13.  (Tr. at 445).  By

netting the final figures found in the third and fourth columns

of defendant's exhibit 21, one reaches the total $13,984.59 in

the fifth column labeled "Variance Between Expected/Actual

[(hereinafter 'the variance'.]"  (Def.'s ex. 21).  The court

finds the variance to have been caused by interference with SAFE

customers as earlier outlined in section I.G.  Inasmuch as the

court has found Secure US chargeable with 83.75% of the

interference with SAFE's West Virginia customer base, it is

responsible for 83.75% of the $13,984.59 variance, or $11,712.09.

---

        [20](...continued)
13 at 3).  The court would note, however, that it is unclear why
Mr. Sargenti made this deduction.  It appears the ending figure
in column 3 is properly treated as not affecting the $38,366.00
that results at the chosen ending point in October 2005.
Although, as will be seen, the "RMR Variance" in column five of
the table at page 3 of exhibit 13 is properly reduced to account
for the exclusion of the time period between June and October
2003, it is not apparent why that same sum need be deducted from
the final figure in column 3.  Inasmuch as the calculation works
in Secure US's favor, the court leaves it undisturbed.

Mr. Sargenti next proposed that the cancelled RMR damage figure was the product of the variance and a multiple of 35.  The court finds reasonable Mr. Sargenti's analysis concerning the calculation and the use of the 35 multiple:

> [T]his category, damages at a 35 multiple, has as its premise the market value of the RMR itself.  In other words, the trades that go on in the industry.  As a guide, we're in the market every day, and RMR of that size trades at about 35, 36 times.  And we felt that that was a fair market multiple for the value of that RMR.
>
>         . . . .
>
> There's a value in the marketplace for that RMR.  We have put a value of 35 times.  Plaintiff has put a value of 40 times.  We would be happy to accept that number.  The value of RMR on a trade basis, if I were to sell it tomorrow, I could sell it for 35 times . . . .

(Tr. at 299-300, 316).  The product of the variance, $11,712.09, and the 35 multiple results in the sum of $409,923.15, a sum which the court finds to a reasonable degree of certainty to be that amount of damages to which SAFE is entitled from Secure US for the cancelled RMR.

Regarding the second category of damages, lost RMR, the calculation proceeds along similar lines as discussed above until one reaches the variance figures in column five of SAFE's exhibit 13, at page 3.  Once those variance figures are calculated on a monthly basis, Mr. Sargenti deducted from them any costs that SAFE would have incurred as a result of having the benefit of

receiving that RMR on a monthly basis, as reflected in the second
part of column five entitled "Costs associated with lost RMR[.]"
(Def.'s ex. 13 at 3).  These cost elements, as summarized in a
text box above the table found at page 3 of exhibit 13, include
the cost to SAFE of monitoring the customer ($3.25), along with
unexplained figures for a "Bank Fee" ($.75), and "Service Cost"
($1.00), all for a total of $5.00 in monthly costs per account
attrited.  (Def.'s ex. 13 at 3).

          Column six of the same table lists the variances on a
month-by-month basis from June 2003 to October 2005.  Column
seven of the same table accumulates these monthly totals,
resulting in a final cumulative figure at October 2005 of
$217,850.00.  (Def.'s ex. 13 at 3).  This figure was reduced by
$6,290.42, to a final figure of $211,559.58 appearing on SAFE's
revised damages calculation found on exhibit 21.  The deduction
was made, again, to reflect the elimination of lost revenue that
occurred, as reflected in the final column of SAFE's exhibit 13
at page 3, between the now disallowed period from June through
October 2003.  (Def.'s ex. 13 at 3).  Based upon these
calculations, the court finds to a reasonable degree of certainty
that the appropriate amount of lost RMR damages assessable to
Secure US is 83.75% of the $211,559.58, or $177,181.14, resulting

45

in a total RMR damage figure of $587,104.29, as opposed to the $701,020.23 sought by SAFE.[21]

Regarding the fourth category, referral damages, Mr. Sargenti testified that SAFE's national portfolios experience a referral rate of 36 to 37 percent over the 11.23 average economic life of its accounts.  Referrals come about as a result of "friends, neighbors and family" spreading the word about their

---

[21]At first blush, one might posit the damages for cancelled RMR and lost RMR result in a windfall to SAFE, allowing it to recover for both the sale value of the accounts and their revenue stream, a stream SAFE would obviously not have were it to sell the accounts.

The court finds Mr. Sargenti has accounted for the windfall argument in his calculations and damages methodology.  In summary, SAFE seeks the lost RMR for the discrete period between the time of the interference and the approximate time of trial. Secure US, in actuality, received this stream of revenue as a result of its interference with the SAFE West Virginia customer base.  As noted, SAFE was forced to terminate its lost RMR calculations as of October 31, 2005, inasmuch as its methodology for calculating that damage category required ongoing, monthly numbers from its accounting department to fill the "Actual Ending RMR" column, a necessary component for calculating the variance. The numbers that populate the "Actual Ending RMR" column were only available up to the time of trial.  SAFE's damages, however, did not cease at the time of trial.  It still lost the benefit of the monthly RMR from the converted accounts as a result of Secure US's interference, a revenue stream that Secure US continues to enjoy as to the accounts purloined by it, less usual attrition. To capture this ongoing damage without speculation concerning the "Actual Ending RMR" it might experience, SAFE chose a more concrete option.  It multiplied the ending variance number in October 2005 by a sale multiple of 35, in essence treating the lost accounts as sold off as of that date.  The court finds this methodology amounts to non-speculative, full compensation as opposed to a windfall.

use of SAFE's security monitoring services.  (Tr. at 317).  After adjusting the predicate amounts to account for an interference-start date of November 2003, which can be ascertained by reference to Exhibit 13 at page 4 and Exhibit 21, Mr. Sargenti calculated the referral damages at $125,583.08.  The court adjusts this figure as well, inasmuch as Secure US is properly chargeable only with 83.75% of this sum.  Based upon these calculations, the court finds to a reasonable degree of certainty that the appropriate amount of referral damages is $105,175.82, resulting in a total damage figure to this point of $692,280.11.

Regarding the third category consisting of goodwill damages, the court notes a vacuum of proof.  No documentary evidence was offered in support and the explanatory testimony was sparse at best, occupying roughly 8 lines of the 463 page transcript.  (Tr. at 319).  The court, accordingly, finds that SAFE failed to prove its goodwill damages.[22]

---

[22]The court notes Secure US's alternate methodology for calculating the damages to which SAFE would be entitled.  The court specifically rejects these calculations as being inconsistent with the industry standard.  The court credits Mr. Sargenti's testimony that his method for computing attrition was standard in the industry, "[v]ery standard, and it is used by all institutional lenders, as well, as I said, the rating agencies for establishing the credit worthiness of collateral in a bond." (Tr. at 310).

47

B.    Punitive Damages


        The supreme court of appeals has noted that review of a
punitive damages award is based upon the following "two-step
paradigm[:]"

> "[F]irst, a determination [must be made concerning] . .
> . whether the conduct of an actor toward another person
> entitles that person to a punitive damage award under
> Mayer v. Frobe, 40 W. Va. 246, 22 S. E. 58 (1895);
> second, if a punitive damage award is justified, then a
> review is mandated to determine if the punitive damage
> award is excessive under Garnes v. Fleming Landfill,
> Inc., 186 W.Va. 656, 413 S.E.2d 897 (1991)."

Syl. pt. 9, Bowyer v. Hi-Lad, Inc., 216 W. Va. 634, 609 S.E.2d
895 (2004) (quoting Syl. pt. 7, Alkire v. First Nat. Bank of
Parsons, 197 W. Va. 122, 475 S.E.2d 122 (1996)).  By analogy,
then, the imposition of a punitive damage award is likewise a
two-step process, namely, whether the conduct of an actor
warrants a punitive award and, if so, in what amount.


        Regarding the first step, Mayer teaches that a punitive
award must be based upon a finding that the wrongdoer's actions
amounted to "gross fraud, malice, oppression, or wanton, willful,
or reckless conduct or criminal indifference to civil obligations
affecting the rights of others."  See syl. pt. 4, in part, Mayer
v. Frobe, 40 W. Va. 246, 246, 22 S. E. 58, 58 (1895).


                                48

Regarding the second step, the court considers a variety of factors as set forth in syllabus point 3 of Garnes and its progeny.  See, e.g., syl. pt. 10, Bowyer, 216 W. Va. 634, 638, 609 S.E.2d 895, 899 (2004).  First, punitive damages should bear a reasonable relationship to the harm that is likely to occur from the wrongdoer's conduct as well as to the harm that actually has occurred.  If the wrongdoer's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small.  If the harm is grievous, the damages should be greater.

Second, the fact finder may consider the reprehensibility of the defendant's conduct.  In performing the analysis, the fact finder considers (1) how long the wrongdoer continued in its actions, (2) whether it was aware its actions were causing or were likely to cause harm, (3) whether it attempted to conceal or cover up its actions or the harm caused by them, (4) whether and how often it engaged in similar conduct in the past, and (5) whether it made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once liability became clear to it.  In regard to this factor, the supreme court of appeals has further adopted the analysis of reprehensibility utilized in State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003):

49

"[T]he most important indicium of the reasonableness of
a punitive damages award is the degree of
reprehensibility of the defendant's conduct."  We have
instructed courts to determine the reprehensibility of
a defendant by considering whether: the harm caused was
physical as opposed to economic; the tortious conduct
evinced an indifference to or a reckless disregard of
the health or safety of others; the target of the
conduct had financial vulnerability; the conduct
involved repeated actions or was an isolated incident;
and the harm was the result of intentional malice,
trickery, or deceit, or mere accident.  The existence
of any one of these factors weighing in favor of a
plaintiff may not be sufficient to sustain a punitive
damages award; and the absence of all of them renders
any award suspect. It should be presumed a plaintiff
has been made whole for his injuries by compensatory
damages, so punitive damages should only be awarded if
the defendant's culpability, after having paid
compensatory damages, is so reprehensible as to warrant
the imposition of further sanctions to achieve
punishment or deterrence."

Boyd v. Goffoli, 216 W. Va. 552, 564-565, 608 S.E.2d 169, 181-82

(2004) (quoting Campbell, 538 U.S. at 419).


     Third, if the wrongdoer profited from its wrongful

conduct, the punitive damages should remove the profit and should

be in excess of the profit, so that the award discourages future

bad acts by the wrongdoer.  Fourth, as a matter of fundamental

fairness, punitive damages should bear a reasonable relationship

to the compensatory damages awarded.  Finally, the wrongdoer's

financial position is relevant.


     There are a host of considerations supporting a finding

that Secure US acted maliciously, oppressively, wantonly, and

willfully in the process of committing two separate torts against
SAFE.

First, at the time Secure US obtained the SAFE
contracts in June 2003, Secure US was aware that SAFE had taken
assignment of the contracts for valuable consideration.  Secure
US was likewise aware that the information in the SAFE contracts
constituted SAFE's confidential and proprietary information and
trade secrets.  Despite this foreknowledge, Secure US set about
to mine helpful commercial data from the contracts and then use
that information to solicit SAFE's customers for its own account.

In order to maximize the value of the raw, contract
data, Ms. Sober was hired by Secure US, given her prior
employment with Kesler and her familiarity with the targeted
customer base.  Secure US permitted Ms. Sober to use both
inflammatory and defamatory representations including, but not
limited to, assertions that SAFE was going out of business, that
SAFE was going bankrupt, that SAFE could no longer monitor their
accounts, that SAFE had vacated the West Virginia marketplace,
and similar false statements.  Secure US allowed these
representations to be made despite knowledge they were untrue and
that they would likely cause considerable alarm amongst SAFE's
customers, some of whom were elderly and particularly susceptible
to predatory commercial practices.

51

Of utmost concern is that Secure US persisted in its tortious misconduct for at least 3 months following a specific request from SAFE that it cease and desist from its damaging course of action.  Secure US only ceased its misconduct when the SAFE circular made the effort commercially unprofitable.  Based upon these factual findings, the court further finds that SAFE is entitled to an award of punitive damages based upon Secure US's malicious, oppressive, wanton, and willful misconduct.

Regarding the amount of punitive damages, the court notes Secure US's tortious acts caused significant harm to both SAFE and its customers.  As noted, SAFE suffered proven economic damages of $692,280.11 resulting from Secure US's activities. Regarding the customer base, the court treats the experiences of Ms. Bledsoe and Ms. Lewis's mother as a representative sampling of the harassment and suffering visited upon a number of SAFE customers.  As noted, Ms. Bledsoe was forced to hang up on the determined and argumentative Ms. Sober.  Further, Ms. Lewis's elderly mother was "really upset" when she was untruthfully informed that her SAFE monitored security system was no longer operating.  (Tr. at 248).[23]

---

[23]Ms. Lewis's parents bought their security system because her father was "a little leery about the west end . . . " in
(continued...)

The reprehensibility of Secure US's misconduct is well-illustrated by those findings already made concerning why SAFE is entitled to punitive damages.  Specifically, after learning of the harm its actions were causing, Secure US persisted for a period of months, only ceasing once its efforts at misappropriation became unprofitable.  Although the harm to SAFE was economic, Secure US's actions posed a genuine risk of great financial harm beyond the economic damages found by the court.  Mr. Sargenti testified, and the court so finds, that interference with SAFE's customer base could in turn impact the prior securitizations of its portfolio, resulting in extreme financial vulnerability and potentially ruinous consequences:

> Q.  And I assume that you would have a concern that you might get knocked down off your Triple A rating if the underlying assets were somehow of a poorer or deteriorating nature than you currently have in place?
>
> A.  Concern is not the word for it.  That triggers a repayment event in a bond.  Anything that happens to those assets is sensitive.

(Tr. at 188).

The court also considers Secure US's financial

---

[23](...continued)
Huntington.  (Tr. at 245, 247).  Ms. Lewis added another reason for her parents' contract with SAFE: "Plus, you know, their health, they wanted it for that, too, because they had that little button they could carry around if they fell or something." (Tr. at 247).  In view of the life-safety issues involved, Ms. Lewis's mother was certainly justified in being upset about the prospect of losing her monitoring service for any period of time.

position.  Mr. Brozik testified that Secure US was enjoying a robust fiscal year in 2005 and had successfully expanded its business from less than 3,800 customers in June 2003, to approximately 4,500 currently.  (Tr. at 391, 423).  Mr. Brozik additionally testified that he expects Secure US's 2005 gross revenues to be in the range of $3,400,000 to $3,500,000.  (Tr. at 424).

Based upon the foregoing, the court finds that Secure US purposefully and intentionally pursued a course of action designed to harm SAFE and its customers.  Taking into account all necessary factors articulated by Garnes, as well as Secure US's current revenue base, made up in part by revenue received from SAFE's purloined accounts, the court additionally finds that a punitive award of $100,000 is justified and necessary.

C.    Prejudgment Interest

The award of prejudgment interest in a diversity case is governed by state law.  Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 633 (4th Cir. 1999); United States v. Dollar Rent A Car Systems, Inc., 712 F.2d 938, 940 (4th Cir. 1983); 19 Charles A. Wright et al., Federal Practice and Procedure § 4505

n. 20 (Elec. ed. 2010).  West Virginia Code section 56-6-31 is

the applicable statute for determining the entitlement to, and

the amount of, prejudgment interest.  Subsection (a) of the

statute provides as follows:

> [I]f the judgment or decree, or any part thereof, is
> for . . . liquidated damages, the amount of . . .
> liquidated damages shall bear interest at the rate in
> effect for the calendar year in which the right to
> bring the same shall have accrued, as determined by the
> court and that established rate shall remain constant
> from that date until the date of the judgment or
> decree, notwithstanding changes in the federal reserve
> district discount rate in effect in subsequent years
> prior to the date of the judgment or decree. . . .

W. Va. Code § 56-6-31(a).  Subsection (b) adds further detail

potentially necessary for ascertaining the amount of prejudgment

interest:

> [T]he rate of interest on judgments and decrees for the
> payment of money, including prejudgment interest, is
> three percentage points above the Fifth Federal Reserve
> District secondary discount rate in effect on the
> second day of January of the year in which the judgment
> or decree is entered: Provided, That the rate of
> prejudgment and post-judgment interest shall not exceed
> eleven percent per annum or be less than seven percent
> per annum. . . .

W. Va. Code § 56-6-31(b).


     The supreme court of appeals has observed that

"[l]iquidated damages as the term is used in W. Va. Code,

56-6-31, are such damages as are reasonably susceptible to

calculation."  O'Neal v. Peake Operating Co., 185 W. Va. 28, 31,

404 S.E.2d 420, 423 (1991).[24]  Inasmuch as the compensatory damages awarded herein are of a character that they could be calculated with certainty at any time, they fall within the category of "liquidated damages" covered by section 56-6-31(a).

In ascertaining the appropriate rate of interest, subsections (a) and (b) of section 56-6-31 must be read in pari materia.  When dealing with prejudgment interest relating to "special damages" or "liquidated damages," the general rate and source information specified by subsection (a) is read in light of the more specific instructions prescribed by subsection (b).

The Legislature's mention in subsection (a) of the "federal reserve district discount rate" warrants general reference to the rates specified by that federal entity. Subsection (b) then supplies the necessary details, including specific use of the "secondary discount rate" published by the "Fifth Federal Reserve District," which is the Fifth District Federal Reserve Bank.

---

[24]Section 56-6-31(a) also permits prejudgment interest for "special damages."  Inasmuch as the compensatory damages here fall within the definition of "liquidated damages," the court need not determine if those damages also are covered by the term "special damages."

56

Inasmuch as Secure US' active interference and defamatory statements commenced in November 2003, the court begins with the rate of 2.5%, which was the secondary discount rate in effect for the Fifth District Federal Reserve Bank for the period running from June 26, 2003, through June 29, 2004. According to subsection (a), this rate remains constant "until the date of the judgment or decree . . . ." W. Va. Code § 56-6-31(a). Added to this 2.5% rate are the three percentage points specified in subsection (b), which aggregates to an applicable rate of 5.5%. Subsection (b) further specifies, however, that the rate of prejudgment interest shall not be less than 7% per year. The court thus uses the minimum rate of 7% for the entire period from November 2003 to the date of the Judgment.

For the seven-year period from November 1, 2003, through October 31, 2010, the prejudgment interest amount, using the compensatory damage amount of $692,280.11 as the principal value, is $339,217.25. For the 4-day period from November 1, 2010, through November 4, 2010, the interest amount is $531.06, for a total award of prejudgment interest on the compensatory damage award of $339,748.31.

The court, accordingly, ORDERS that SAFE be, and it hereby is, awarded damages, including prejudgment interest on the compensatory portion only, in the total sum of $1,132,028.42.[25]

D.   Injunctive Relief

SAFE has additionally requested injunctive relief to prevent Secure US from (1) having any further contact with SAFE's customers, as they are reflected on the spreadsheet prepared by Secure US, (2) disseminating any further false statements about SAFE, or (3) continuing to misuse SAFE's confidential and proprietary customer information obtained through Kesler.

Based upon the foregoing findings, the requested relief is appropriate.  The court, accordingly, ORDERS that Secure US be, and it hereby is, enjoined from (1) making any further use of the proprietary SAFE contracts, (2) disseminating any further

_____

[25]For purposes of determining postjudgment interest, "[f]ederal law, rather than state law, governs the calculation . . . in diversity cases."  See Hitachi, 166 F.3d at 633 (citing Forest Sales Corp. v. Bedingfield, 881 F.2d 111, 113 (4th Cir. 1989)); see also 28 U.S.C.A. § 1961 ("Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . . the date of the judgment.").

false statements about SAFE, or (3) continuing to misuse SAFE's

confidential and proprietary customer information obtained

through Kesler.  The parties are otherwise free to compete with

one another, provided they do not do so in a manner proscribed by

law.

The Clerk is directed to forward copies of this written

opinion and order to all counsel of record.

DATED:  November 4, 2010

John T. Copenhaver, Jr.
United States District Judge